# EXHIBIT 1

| | |
|---|---|
| DISTRICT COURT, ARAPAHOE COUNTY, STATE OF COLORADO<br>7325 S. Potomac Street,<br>Centennial, CO 80112 | DATE FILED: August 11, 2023 1:21 PM<br>FILING ID: 1F8A4D2AF6365<br>CASE NUMBER: 2023CV31550 |
| **JEANETTA VAUGHN,**<br><br>    Plaintiff,<br><br>v.<br><br>**JP MORGAN CHASE & CO. d/b/a CHASE BANK; a corporation, and**<br>**TRINA PELECH; an individual**<br><br>    Defendant. | ▲COURT USE ONLY▲ |
| *Attorneys for Plaintiff:*<br><br>Iris Halpern (Reg. No. 53112)<br>Crist Whitney (Reg. No. 56608)<br>RATHOD \| MOHAMEDBHAI, LLC<br>2701 Lawrence St., Suite 100<br>Denver, CO 80205<br>T: (303) 578-4400<br>Email: ih@rmlawyers.com; cw@rmlawyers.com | Case No.:<br><br>Division: |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff Jeanetta Vaughn, by and through her undersigned counsel Iris Halpern and Crist Whitney of Rathod | Mohamedbhai LLC, respectfully alleges for her Complaint and Jury Demand as follows:

## **INTRODUCTION**

On the morning of June 9, 2022, Jeanetta Vaughn entered the JP Morgan Chase & Co. Bank ("Chase") branch on 1101 South Buckley Road in Aurora, Colorado. Ms. Vaughn is a Black, churchgoing, mother of three who spent her career at the Department of Veteran's Affairs. She has

been a longtime Chase member. As Ms. Vaughn entered the bank that day and took a seat in the lobby, Branch Manager Trina Pelech, who is White, immediately approached her, loudly asking Ms. Vaughn if she could help her with anything. Ms. Vaughn calmly responded that she needed no assistance and was just there for personal banking purposes. Instead of accepting Ms. Vaughn's response, Ms. Pelech told Ms. Vaughn that she was "not welcome" at Chase and called the police on her, accusing Ms. Vaughn of trespassing. When the police arrived and informed Ms. Pelech that Ms. Vaughn felt discriminated against, Ms. Pelech's telling response was "that's always the excuse…" Ms. Pelech ordered the police to remove Ms. Vaughn from the premises anyway.

As a result of Defendants unlawful and degrading treatment of Ms. Vaughn, she now brings claims under the Colorado Anti-Discrimination Act, for a violation of her Constitutional Rights to be free of race discrimination under 42 U.S.C. §1981, and state court torts for emotional distress and defamation. It is no trivial matter to call the police on a Black person, falsely accusing him or her of criminal misconduct, merely for engaging in routine and mundane chores the rest of us do daily. Inherent in such actions is the very real threat of arrest and physical violence; and doing so invokes the ghosts of segregation not long past when White citizens frequently exploited law enforcement to relegate Black citizens to second-class status, entrenching racist hierarchies and weaponizing the police to exclude Black citizens from the public sphere. Such discrimination must no longer be condoned.

## I.      PARTIES, JURISDICTION, AND VENUE

1.      At all times relevant to this Complaint, Plaintiff Jeanetta Vaughn was a legal resident of and domiciled in the State of Colorado.

2.      Defendant Chase Bank is a New York Corporation with a principal office street address in Delaware and principal office mailing address in New York, which at all times relevant to this Complaint has been duly registered with the Colorado Secretary of State to do business in the state of Colorado and has conducted such business in the state.

3.      Defendant Chase Bank's registered agent located at 19661 E. 48th Place, Denver, Colorado 80249.

4.      Defendant Chase operates many bank branches across the state, including a bank branch located at 1101 South Buckley Road in Aurora, Colorado.

5.      Defendant Trina Pelech is a resident of Colorado and at all relevant times hereto, she was personally involved in committing the discriminatory actions against Ms. Vaughn complained of herein.

6.      This Court has jurisdiction over this matter pursuant to C.R.S. § 13-1-124.

7.      Venue is proper pursuant to C.R.C.P. 98 as the allegations contained herein occurred within the boundaries of Arapahoe County.

## II.      ADMINISTRATIVE EXHAUSTION

8.      Ms. Vaughn filed a charge of discrimination with the Colorado Civil Rights Division ("CCRD") within sixty days of the discriminatory acts committed by Chase Bank.

9.      Ms. Vaughn alleged in her charge of discrimination that she was the victim of race discrimination within the meaning of the public accommodation provisions of the Colorado Anti-Discrimination Act ("CADA") and described the circumstances.

10.     The CCRD issued a notice of right to sue, upon Ms. Vaughn's request, on November 29, 2022.

11. The parties signed several tolling agreements, with the final tolling agreement expiring on August 11, 2023.

12. As a result, Ms. Vaughn is timely filing her CADA claims within the tolling period.

13. None of Ms. Vaughn's other claims require administrative exhaustion.

### III.   FACTUAL ALLEGATIONS

14. Plaintiff Jeanetta Vaughn is over sixty years of age, a Colorado resident, and a previous longtime federal government worker.

15. Ms. Vaughn is also a Black woman.

16. Ms. Vaughn earned her Bachelor of Science in Education.

17. Ms. Vaughn has worked as a teacher, substitute teacher, at a bank, in hospitals, and in the aerospace field.

18. Ms. Vaughn was employed with the Department of Veteran's Affairs, and had been employed with the federal government for nearly twelve years.

19. Ms. Vaughn is a wife to James Vaughn Sr., and a mother to her son as well as to Mr. Vaughn's two sons.

20. Ms. Vaughn prays daily and attends church regularly.

21. Since 2019, Ms. Vaughn has been a dependable member of Chase, utilizing its banking services on many occasions.

**Chase Bank and Trina Pelech Discriminate Against Jeanetta Vaughn**

22. On the morning of June 9, 2022, Ms. Vaughn drove to the Chase branch located at 1101 South Buckley Road in Aurora, Colorado to withdraw money from her Chase account, as she has routinely done in the past, and to obtain counter checks.

23.     Ms. Vaughn entered the bank at 11:34am.

24.     As Ms. Vaughn walked into the branch that morning, she sat down to unlock her Chase card as she typically does for security reasons.

25.     Chase offers a personal banking service that allows customers to lock and unlock their debit card just in case the card is lost or stolen. This provides the Chase member additional security and allows them to instantly stop purchases or cash advances on their Chase card.

26.     Ms. Vaughn, out of caution, locks and unlocks her Chase card between usage. Ms. Vaughn locks her bank card as a safety measure just in case she loses it. She noticed that businesses no longer ask for ID to make a purchase so she locks her card to ensure someone else could not make purchases.

27.     There is a four-step process to unlock the card on the "Chase Mobile" phone application.

28.     Before she could proceed with any transactions, she would need to log into the "Chase Mobile" phone application to unlock her card.

29.     To avoid inconveniencing anyone, Ms. Vaughn sat in one of the branch's customer lobby chairs while she worked to unlock her card.

30.     At 11:35am, while Ms. Vaughn proceeded to log into the "Chase Mobile" app to unlock her account, Chase Branch Manager Trina Pelech, a White female, approached Ms. Vaughn.

31.     Ms. Pelech approached Ms. Vaughn less than ninety seconds after Ms. Vaughn sat down to unlock her card.

32.     Ms. Pelech loudly asked Ms. Vaughn whether she could help her with something, to which Ms. Vaughn responded that when she finished unlocking her card, she would get in line to speak with a bank teller.

33.     Instead of accepting Ms. Vaughn's response, Ms. Pelech raised her voice, told Ms. Vaughn that she did not need to be rude, and angrily told Ms. Vaughn that she was "not welcome" at the bank branch.

34.     Surprised by Ms. Pelech's tone, Ms. Vaughn said, "What are you talking about? I said I am doing business, trying to open up my account so I can get in line."

35.     Ms. Pelech did not ask Ms. Vaughn to see proof of membership.

36.     Instead, ignoring Ms. Vaughn, Ms. Pelech reiterated that, "You're not welcome here," and threatened to call the police.

37.     Shocked, Ms. Vaughn replied that she would sit and wait for the police to come so that they could record the events at the Chase branch.

38.     After Ms. Pelech threatened to call the police, Ms. Pelech claimed that Ms. Vaughn said, "go ahead, I'm going to videotape *you*."

39.     Ms. Vaughn, in fact, never videotaped Ms. Pelech.

40.     Ms. Vaughn also never indicated that she would videotape any bank operations or services.

41.     Ms. Pelech ordered Ms. Vaughn to leave the premises well before either of them ever discussed video recording the interaction.

42.     Ms. Pelech also stated that she would call the police on Ms. Vaughn before Ms. Vaughn mentioned anything about video recording.

43.     The interaction between Ms. Vaughn and Ms. Pelech lasted less than a minute.

44.     Their interaction was captured on the bank branch's video cameras.

45.     At no point during their interaction did the Chase video footage show Ms. Vaughn videotaping Ms. Pelech or Chase branch procedures.

46.     After Ms. Vaughn continued to sit patiently in the seat, Ms. Pelech huffed out of the lobby to call the police.

47.     According to police records, Ms. Pelech did so at 11:36am.

48.     While Ms. Pelech called the police, Ms. Vaughn proceeded to unlock her Chase card on the "Chase Mobile" app, texted her husband, James Vaughn Sr., to tell him what happened, and then called him, asking him to leave work and meet her at the bank.

49.     After being informed about this extremely alarming situation, Mr. Vaughn said that he would drive to the Chase branch immediately, despite being at work and on the clock.

50.     Also, around 11:40am, while Ms. Pelech called the police, Hayem Serra, a Chase employee, provided Ms. Vaughn with her own business card as well as the business card of Ms. Pelech, identifying Ms. Pelech as the Branch Manager and a Vice President.

51.     On Ms. Pelech's 911 call, Ms. Pelech admitted that Ms. Vaughn told her that when she was ready, she would approach the bank teller.

52.     Ms. Pelech then accused Ms. Vaughn of criminal trespass.

53.     On the 911 call, Ms. Pelech also admitted that the only reason she ordered Ms. Vaughn to leave the branch was because she was being "rude" and "aggressive," and for no other reason.

54.     Chase falsely told the Colorado Civil Rights Division during the agency's investigation of Ms. Vaughn's charge that Ms. Vaughn pulled out her phone camera and began recording the interaction after being ordered to leave the branch.

55.     Ms. Vaughn never recorded Ms. Pelech, nor did she imply she would until after Ms. Pelech threatened to call the police on her.

56.     Chase also falsely told the Colorado Civil Rights Division during the agency's investigation that, "Ms. Pelech cautioned Ms. Vaughn that if Ms. Vaughn did not stop recording, she would have to leave, or Ms. Pelech would be forced to call the police."

57.     However, Ms. Pelech admitted in her 911 call that she ordered Ms. Vaughn to leave the branch only because she thought Ms. Vaughn was being rude.

58.     There is no dispute that Ms. Vaughn was not recording Ms. Pelech or anyone else at that time.

## Police Officers Arrive and Interrogate Ms. Vaughn

59.     Ms. Vaughn remained seated until two Aurora police officers, Officer Timothy Gramse and Officer Donald Hickox, entered the Chase branch at around 11:46am.

60.     The two officers informed Ms. Vaughn that they were responding to a report of trespassing.

61.     Ms. Vaughn calmly and fully complied with the police officers' requests and answered their questions.

62.     At first, Ms. Vaughn feared for her life as the officers approached her.

63.     Ms. Vaughn understood that as a Black woman she needed to keep calm and deescalate the situation because the dangerous, oftentimes violent, consequences to Black victims when White individuals call law enforcement on Black individuals and accuse them of crimes.

64.     Ms. Vaughn hid her fears and explained to the police officers why she was in the Chase branch lobby, reiterating that she was a member and that she came to the Chase branch to conduct her bank transactions.

65.     She told the officers that after she told Ms. Pelech she was unlocking her card and would into line, Ms. Pelech told her "that she did not have to be rude." She then stated that she asked Ms. Pelech what she was talking about because she was just doing business and trying to unlock her account.

66.     Ms. Vaughn confirmed with the officers that Ms. Pelech told her that, "You're not welcomed here," and threatened to call the police on her.

67.     Ms. Vaughn then told the officers that her husband was on the way, and she was waiting for him to arrive.

68.     Officer Gramse proceeded to speak with Ms. Pelech in a back office.

69.     Ms. Pelech told Officer Gramse that it was her job to approach customers who sat in the lobby and ask if she could help them.

70.     Ms. Pelech alleged that Ms. Vaughn ignored her, so she asked again. Ms. Pelech then claimed that Ms. Vaughn immediately said, "Leave me alone, I'm busy, when I'm ready, I'll come up."

71.    Ms. Pelech made this statement while mimicking how Black women supposedly speak, with her hand raised, her neck swinging, and her face fixed into a scowl. These types of gestures are typical of the "Angry Black Woman" trope.

72.    Ms. Pelech told Officer Gramse that she said to Ms. Vaughn, "You're being very rude and if you can't be decent then you are welcome to leave."

73.    Ms. Pelech claimed she informed Ms. Vaughn that she had the right to make Ms. Vaughn leave after Ms. Vaughn protested that she did not.

74.    Then Ms. Pelech claimed that Ms. Vaughn allegedly stated, "Go ahead, I will videotape you."

75.    She then alleged, physically enacting the act for Officer Gramse, that Ms. Vaughn stuck her phone up at face level and started recording her.

76.    Chase video camera footage clearly shows that Ms. Vaughn did not pick her phone up and record Ms. Pelech in any such a manner.

77.    After answering several of Officer Gramse questions, Ms. Pelech flatly replied again, referring to Ms. Vaughn, that, "She is not welcome here."

78.    Officer Gramse refused to arrest or remove Ms. Vaughn, explaining to Ms. Pelech that, "The last resort is putting my hands on her, charging her with trespassing and throwing her out of the bank especially if she is a customer here."

79.    Officer Gramse then said, "She doesn't seem to be a danger to me."

80.    Ms. Pelech agreed and said, "No, I don't believe she is a danger."

81.    This statement is contrary to the statements Ms. Pelech made on the 911 call when she described Ms. Vaughn as "aggressive."

82.     When Ms. Pelech again added that Ms. Vaughn was rude, Officer Gramse said, "Being rude in the bank is not---"

83.     At that point, Ms. Pelech cutoff Officer Gramse and wouldn't listen to him, but Office Gramse later told Ms. Vaughn that he informed Ms. Pelech, "Being rude in the bank is not a matter for law enforcement."

84.     When Ms. Pelech over-spoke Office Gramse, cutting him off mid-sentence, she argued that Ms. Vaughn could not videotape in the bank. Officer Gramse asked if that was a bank policy. Ms. Pelech said it was a bank policy because it is a secure place and they don't want people "taking video of our procedures and robbing us later."

85.     There were no postings or other information available in the bank branch indicating or explaining to customers that video recording is prohibited on the premises.

86.     At any rate, Ms. Vaughn only indicated that she might videotape Ms. Pelech after Ms. Pelech threatened to call the police on her.

87.     According to even Ms. Pelech's own testimony, Ms. Vaughn also never alleged she would record bank procedures, only that she would videotape Ms. Pelech if made her leave.

88.     Officer Gramse left the office and spoke to Ms. Vaughn again.

89.     Ms. Vaughn, by this time, felt completely humiliated as other customers and employees stared at her, and some bank tellers even laughed at her.

90.     Ms. Vaughn, despite the humiliation she felt, continued to converse with the police officers in a calm manner so the police officers did not turn aggressive on the chance that she made any comments that might offend them or escalate the situation.

91.     Officer Gramse explained that Ms. Pelech felt Ms. Vaughn was trespassing and as a last resort Ms. Vaughn could be charged with trespassing.

92.     Obviously frustrated and deeply hurt and upset by the experience, Ms. Vaughn told the officers to charge her with trespassing. Officer Gramse, however, said he did not want to do that.

93.     Ms. Vaughn asked Officer Gramse why the chairs in the lobby were even there. Officer Gramse replied that it was a good question.

94.     Ms. Vaughn then asked Officer Gramse what reason Ms. Pelech had for telling her to leave the bank. Officer Gramse replied that Ms. Pelech claimed Ms. Vaughn was videotaping.

95.     Ms. Vaughn explained to Officer Gramse that she had only informed to Ms. Pelech that she would record her because Ms. Pelech was going to call the police.

96.     Ms. Vaughn further explained that she may have gestured as if she would videotape Ms. Pelech, but she never videotaped anything because the police had their own body-cameras.

97.     Officer Gramse asked again why Ms. Vaughn was at the bank, stating "Well, anybody could come in and say they're a customer of the bank and they were going to conduct business…even a homeless person that comes in here because it is raining out or whatever…"

98.     Ms. Vaughn asked Officer Gramse why he did not ask her for her ID to prove that she has an account there. Mr. Gramse said, "I could do that." He finally took her name and date of birth and wrote it down.

99.     No one throughout this whole experience ever asked Ms. Vaughn for proof of Chase membership, including Ms. Pelech.

100.     Ms. Vaughn explained again why she was there and explained to the officers why she needed counter checks.

101.     Ms. Vaughn also explained that she called her husband because Ms. Pelech had called the police on her.

102.     Officer Gramse asked Ms. Vaughn, "I hope you don't feel we were being rude to you." Ms. Vaughn explained that she did not think they had been rude because she has family in law enforcement and understood their job. She also added that these were the types of situations officers were called into where they were wasting their time. Officer Hickox smiled and nodded emphatically.

103.     Ms. Vaughn asked Officer Gramse whether she was being asked to leave and if so, she wanted Ms. Pelech to tell the officers that she needed to be removed.

104.     Officer Gramse went to the back office and told Ms. Pelech that if she still wanted Ms. Vaughn to leave, she will leave when her husband arrived.

105.     Officer Gramse then told Ms. Pelech that he believed Ms. Vaughn felt singled out because she was African American.

106.     Ms. Pelech dramatically rolled her eyes and stated, "That's always the excuse..."

107.     Officer Gramse then asked her whether she had anything posted in the bank that said there was no videotaping in the bank. Ms. Pelech replied, "No, but I told her. Obviously, she knew, to get a rise out of me."

108.     Ms. Pelech reiterated to Officer Gramse that, "I do have the authority to make her leave. I have been given that authority."

109.    Ms. Pelech further stated, "If you're going to threaten to videotape us and I say you're not allowed to and you're going to keep pointing it at me, then you're going to have to go."

110.    However, during her call to 911, Ms. Pelech did not state that Ms. Vaughn had "threatened" to record her. Instead, she told the dispatcher that Ms. Vaughn had started to record her.

111.    Furthermore, Chase's own video cameras do not show Ms. Vaughn pointing her phone and recording Ms. Pelech at any point in time during the less than one minute interaction the two of them had with each other before Ms. Pelech went to call the police.

112.    Officer Gramse informed Ms. Pelech that, "Well, we're not going to make her leave right now. She says she is a customer. We're going to go wait in our car for her husband to get here and then if you tell her to leave, she said she'll leave."

113.    Officer Gramse reiterated to Ms. Pelech that Ms. Vaughn was sitting there to unlock her card and Ms. Pelech then said, "This did not have to happen. All she had to do was let me know what she was doing without the snarky attitude and threatening me with video. I can help people all day long but you're not going to video *me*."

114.    Officer Gramse returned and told Ms. Vaughn they will wait in their patrol cars until Mr. Vaughn arrived.

115.    Shortly afterwards, Mr. Vaughn arrived, and briefly spoke with the police officers outside.

116.    Officer Hickox explained to Mr. Vaughn that there seemed to be an issue between the two women and Ms. Pelech dragged the officers into it.

117.    Officer Gramse explained that this was a trespass call, but they were not looking to charge Ms. Vaughn with anything.

118.    Officer Hickox said, "I would just add this, if she does feel like she was singled out or…for a lack of a better term discriminated against I would request the…because they have surveillance in this lobby of what transpired before we ever got there. That's something she can take up with Chase."

119.    Mr. Vaughn nodded then came inside with the officers to where Ms. Vaughn waited.

120.    The two officers wrote down the information for Ms. Vaughn to access the officer's bodycam footage. Officer Gramse said, "I am sorry this happened."

121.    Mr. Vaughn then left the Chase branch followed by Ms. Vaughn.

**Chase Bank's Long History of Discrimination Against Black Customers**

122.    Chase has a pattern of discriminatory treatment against its Black customers, giving voice to the adverse consequences of "banking while Black."

123.    On December 18, 2021, Dr. Malika Mitchell-Stewart, a Black woman, attempted to deposit a $16,000 check. In response, Chase staff members accused her of fraud and questioned her employment as a doctor, denying her services.

124.    In 2019, a former NFL player named Jimmy Kennedy attempted to become a "private client" with Chase and was given "the run-around" more than once. He recorded his conversation with a Chase employee, who said that Mr. Kennedy was "bigger than the average person" and "also an African-American." The employee also said "[w]e're in Arizona…[t]hey don't see people like you a lot."

15

125.    In a similar instance, also at an Arizona Chase bank, a Chase manager told a Black employee not to help a Black woman who received a $372,000 wrongful death settlement after her son died. The Black employee wanted to help the Black woman properly invest her money, however, his boss told the Black employee, "You've got somebody who's coming from Section 8, never had a nickel to spend, and now she's got $400,000. What do you think's going to happen with that money? It's gone." The Chase manager further added, "This is not money she respects. She didn't earn it."

126.    Also, on April 25, 2019, Chase employees in White Plains, New York called the police on Mount Vernon, New York's Mayor Richard Thomas, a Black man, as the Mayor attempted to deposit a six-figure check and get access to the City's online banking records. Mayor Thomas believed that his race certainly played a role in the Chase employees calling the police.

127.    Chase, in fact, admitted to receiving four complaints of racial discrimination since September 2021 at *the very same branch* where the discrimination against Ms. Vaughn took place.

128.    Three of these complaints specify that they were made by Black customers.

129.    Black customers complained that they were discriminated against with regard to cashing a check, restrictions on their account, being asked additional identifying questions, and not receiving promotional credit for opening an account.

130.    Beyond Chase's customers, Chase has continued this discriminatory pattern with its own employees.

131.    In 2018, Chase came to a $24 million settlement with financial advisors who were discriminated against because they were Black by assigning them to poorer bank branches, understaffing them, and not including them in a program for wealthy clients.

### IV.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of Colorado Anti-Discrimination Act, C.R.S. § 24-34-601 et seq.**
**Discrimination on the Basis of Race**
**Against Chase Bank**

132.   Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

133.   Plaintiff has exhausted remedies by filing charges of discrimination with the CCRD.

134.   The Colorado Anti-Discrimination Act, C.R.S. § 24-34-601(2)(a), makes it unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of race, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of race.

135.   Under C.R.S. § 24-34-601(1) a "place of public accommodation" means any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public.

136.   Jeanetta Vaughn is a Black woman. Based on her race, Ms. Vaughn is a member of a class of citizens protected by CADA.

137.   On June 9, 2022, Ms. Vaughn entered Chase Bank for personal banking purposes.

138.    She had every right to be at that Chase Bank branch.

139.   Within minutes of her entering the lobby and sitting down in a chair provided to customers, Trina Pelech approached Ms. Vaughn and began to grill her about her assistance needs.

140.     When Ms. Vaughn responded that she did not need assistance and explained that she needed to unlock her card before standing in the bank teller line, Ms. Pelech told her that she did not need to be rude then raised her voice and angrily told Ms. Vaughn that she was "not welcome" in the bank. She then threatened to call the police on her.

141.     Ms. Pelech did in fact call the police and accused Ms. Vaughn of being "aggressive," "trespassing," and implied that Ms. Vaughn had been recording the bank operations before the call, when it is undisputed that Ms. Vaughn only suggested she'd record Ms. Pelech after Ms. Pelech threatened to call the police on her.

142.     Ms. Vaughn was denied the full and equal enjoyment of this banking service when Ms. Pelech told her that she was "not welcome" at the bank and called the police on her, requiring her to leave before she could complete her personal banking business.

143.     Defendant denied Ms. Vaughn the full and equal enjoyment of this banking service because she is Black.

144.     Defendant's conduct described herein violated the anti-discrimination laws of the State of Colorado and constitutes prohibited discriminatory practices thereunder.

145.     Defendant's conduct described herein was done with malice or reckless indifference of Ms. Vaughn's protected rights under state law.

146.     As a direct result of Defendant's actions, Ms. Vaughn has suffered significant injuries, damages, and losses to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1981**
**Discrimination on the Basis of Race and/or Ethnicity/Alienage**
**Against All Defendants**

147.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

148.    Ms. Vaughn is a Black woman and a member of a protected class under 42 U.S.C. § 1981.

149.    Defendants discriminated against Ms. Vaughn in violation of 42 U.S.C. § 1981 based on her race.

150.    Defendants subjected Ms. Vaughn to adverse treatment because of her race, including the denial of equal access to the premises and the services provided by Chase Bank, explicit refusal of service, treating Ms. Vaughn at all times with pronounced hostility, threats, and calling the police on her, and forcibly removing her from the premises under duress.

151.    But for Ms. Vaughn's race, she would have not been denied the right to enjoy all benefits, privileges, terms, and conditions of her contractual relationship as a Chase member.

152.    The effect of the practices complained of above has been to deprive Ms. Vaughn of the right to enjoy all the benefits, privileges, terms, and conditions of her contractual relationship as a Chase member and to deprive Ms. Vaughn of the full and equal benefit of the laws, because of her race.

153.    The unlawful discriminatory practices complained of above were intentional.

154.    The unlawful discriminatory practices complained of above were done with malice or reckless indifference to the federally protected rights of Ms. Vaughn.

155.    As a direct result of Defendant's actions, Ms. Vaughn has suffered significant injuries, damages, and losses to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress**
**Against All Defendants**

156.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

157.    In Colorado, to establish a claim for negligent infliction of emotional distress ("NEID") a plaintiff must show that : (1) the defendant's negligence (2) created an unreasonable risk of physical harm that (3) caused the plaintiff to be put in fear for his or her own safety, (4) the plaintiff either (a) suffered physical injury or (b) was in the "zone of danger" created by defendant's negligent conduct, (5) the plaintiff's fear had "physical consequences" or resulted in "long-continued emotional disturbance," and (6) that the plaintiff's fear was the cause of the damages sought. *Draper v. DeFrenchi-Gordineer*, 282 P.3d 489, 497 (Colo. App. 2011) (citing *Colwell v. Mentzer Investments, Inc*., 973 P.2d 631 638 (Colo. App. 1998); *Culpepper v. Pearl Street Building, Inc.*, 877 P.2d 877, 880 n. 3 (Colo. 1994); *Towns v. Anderson*, 579 P.2d 1163, 1165 (Colo. 1978)).

158.    Ms. Pelech's conduct, as Defendant's agent, was negligent because she called the police falsely claiming that Ms. Vaughn was acting "aggressively" and videotaping the inside of the Branch and therefore, was trespassing. However, Ms. Vaughn was neither acting aggressively, threateningly, videotaping, nor trespassing in this place of public accommodation. A reasonable person would have known that sitting in the lobby and checking one's account on one's phone for

a few minutes as one prepared to do business before standing in the bank teller line is not trespassing.

159.     Ms. Pelech's conduct created an unreasonable risk of physical harm because she called the police and lied about Ms. Vaughn acting aggressively, videotaping, and unlawfully trespassing, which Ms. Vaughn was not.

160.     Indicating to the police, who had weapons when they entered the Chase branch and had the power to take violent action, that Ms. Vaughn was acting aggressively and unlawfully was dangerous and posed an unreasonable risk of physical harm to Ms. Vaughn.

161.     Ms. Vaughn, as a Black woman aware of the violent actions that have been taken against Black people during police interactions, was put in fear for her own safety when the police were called and when they arrived.

162.     Ms. Vaughn was in the zone of danger because she was in immediate risk of physical harm from Ms. Pelech's negligent conduct. Ms. Pelech's call to the police was about Ms. Vaughn, so the police interaction was directed at Ms. Vaughn while she was in the Chase branch.

163.     Ms. Vaughn's fear resulted in long-continued emotional disturbance, causing her to experience ongoing anxiety and stress, as well as causing her to become afraid to go into banks and public spaces in general. Ms. Vaughn's fear also had physical consequences including difficulty sleeping, as she continues to relive this traumatic experience from the bank when she tries to sleep.

164.     Ms. Vaughn's fear from this interaction was the cause of the damages sought.

165.     As a result of Defendants' actions, Ms. Vaughn has suffered significant injuries, damages, and losses to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**Defamation per se**
**Against All Defendants**

166.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

167.     In Colorado, the elements of defamation are: (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication."  *Williams v. Dist. Court*, 866 P.2d 908,911 n.4 (Colo. 1993).

168.     Additionally, (1) the defamed party must prove the falsity of the statement by clear and convincing evidence, rather than by a mere preponderance; (2) the defamed party must prove that the speaker published the statement with actual malice—that is, with actual knowledge that the statement was false or with reckless disregard for whether the statement was true; and (3) the defamed party must establish actual damages to maintain the action, even if the statement is defamatory per se. *McIntyre v. Jones*, 194 P.3d 519, 524 (Colo. App. 2008).

169.     Defamation per se is actionable without proof of special damages where a libelous statement is: (1) on its face and without extrinsic proof, unmistakably recognized as injurious and (2) specifically directed at the plaintiff or identity. *Gordon v. Boyles*, 99 P.3d 75, 78–79 (Colo. App. 2004).

170.     The traditional categories of slander per se are imputation of (1) a criminal offense; (2) a loathsome disease; (3) a matter incompatible with the individual's business, trade, profession, or office; or (4) serious sexual misconduct." *Id*.

171.    Contrary to her 911 call, Ms. Vaughn was not criminally trespassing or acting aggressively or in a threatening manner. Nor was Ms. Vaughn violating any written video recording policies of Chase Bank.

172.    Not only did Ms. Pelech admit this to the police, who recorded it, but Chase's own security footage establishes this as well. Thus, Ms. Pelech's statement is demonstrably false by clear and convincing evidence.

173.    Ms. Pelech knew that Ms. Vaughn was not trespassing, given that Ms. Vaughn was a member of Chase, and Ms. Vaughn told her so.

174.    Ms. Pelech falsely accused Ms. Vaughn of engaging in criminal misconduct and threatening "aggressive" behavior.

175.    These false statements resulted in an extended police interaction and the threat of arrest.

176.    As a result of Defendants' actions, Ms. Vaughn has suffered significant injuries, damages, and losses to be determined at trial.

## V.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including but not limited to the following:

1. Actual economic damages as established at trial;

2. Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses;

3. Punitive damages for all claims as allowed by law for all such claims where applicable;

4. Exemplary damages for all claims as allowed by law for all such claims where applicable;

5. Prejudgment and post-judgment interest at the highest lawful rate;

6. Appropriate tax off-set;

7. Attorneys' fees and costs; and

8. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED: August 11, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Iris Halpern*
Iris Halpern
Crist Whitney
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400
ih@rmlawyers.com
cw@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

     I hereby certify that on the 11th day of August 2023, I electronically filed the foregoing **COMPLAINT AND JURY DEMAND** with the Clerk of Court using the Colorado Courts E-Filing system to the following:

Naomi Beer
Sarah Mathews
GREENBERG TRAURIG, LLP
1144 15th Street Suite 3300
Denver, CO 80202
Telephone: 303.572.6512
Email: beern@gtlaw.com
       mathewss@gtlaw.com


*Attorneys for Defendant*


*s/ Iris Halpern*

Iris Halpern