IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-02266-CNS-NRN

JEANETTA VAUGHN,

     Plaintiff,

v.

JP MORGAN CHASE & CO. D/B/A CHASE BANK; A CORPORATION;
TRINA PELECH, AN INDIVIDUAL,

     Defendants.

---

**ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION**

---

Before the Court are Defendants JPMorgan Chase Bank, N.A. ("Chase") and Trina Pelech's Motion to Stay the Proceedings Pending Disposition of Defendants' Motion to Compel Arbitration (ECF No. 18) and Motion to Compel Arbitration and Stay Proceedings (ECF No. 19). Plaintiff filed responses to both motions (ECF No. 23 (Motion to Stay), ECF No. 28 (Motion to Compel Arbitration)), and Defendants filed reply briefs (ECF No. 32 (Motion to Compel Arbitration), ECF No. 33 (Motion to Stay)). The Court has reviewed the briefs and the relevant authority. For the reasons set forth in this Order, the Court denies the Motion to Compel Arbitration and denies as moot the Motion to Stay.

## I.   BACKGROUND[1]

This is a racial-discrimination case. On June 9, 2022, Plaintiff Jeanetta Vaughn, a Chase customer, walked into a Chase branch in Aurora, Colorado, around noon to withdraw money from her account and obtain counter checks (ECF No. 4, ¶¶ 21–23). Upon entering the bank, Ms. Vaughn sat down in a chair in the lobby reserved for customers and began to unlock her Chase card from her phone's Chase Bank Mobile Application (*id.*, ¶¶ 24, 29).[2] Ninety seconds after Ms. Vaughn sat down, Defendant Trina Pelech, the Chase Branch Manager and Vice President, approached Ms. Vaughn and asked whether she could help Ms. Vaughn (*id.*, ¶¶ 30–32, 50). Because it is relevant to Plaintiff's allegations, the Court notes that Ms. Vaughn is Black and Ms. Pelech is White (*id.*, ¶¶ 15, 30).

In response to Ms. Pelech's question, Ms. Vaughn explained that she was unlocking her card on her phone (*id.*, ¶ 32). Purportedly unsatisfied with this response, Ms. Pelech told Ms. Vaughn that she was not welcome in the bank and threatened to call the police (*id.*, ¶¶ 33–36). The interaction took place over the span of a minute and was captured by the bank's video cameras (*id.*, ¶¶ 43–44). But the incident did not end there. Ms. Pelech left the lobby and called 911 (*id.*, ¶¶ 46–47). She told the 911 operator that

---

[1] The background facts are taken from the allegations in Plaintiff's Complaint (ECF No. 4) and the materials submitted in connection with the parties' briefing on the Motion to Compel Arbitration (ECF No. 19, No. 28, and No. 32).

[2] Ms. Vaughn explains that "Chase offers a personal banking service that allows customers to lock and unlock their debit card" as an additional safety feature to prevent unwanted purchases (*id.*, ¶ 25). Ms. Vaughn habitually locks her Chase card between uses in the event her card is lost or stolen (*id.*, ¶ 26). Once inside the Chase app, there is four-step process to unlock the card (*id.*, ¶ 27).

Ms. Vaughn was being rude and aggressive and criminally trespassing on bank property (*id.*, ¶¶ 51–53).

There is a dispute over whether Plaintiff was not unlocking her account but actually videoing in the Branch against Chase policy (ECF No. 19 at 4). According to the Complaint, "Chase falsely told the Colorado Civil Rights Division during the agency's investigation of Ms. Vaughn's charge that Ms. Vaughn pulled out her phone camera and began recording the interaction after being ordered to leave the branch" (ECF No. 4, ¶ 54). Also according to the Complaint, Chase falsely told the Colorado Civil Rights Division that, "Ms. Pelech cautioned Ms. Vaughn that if Ms. Vaughn did not stop recording, she would have to leave, or Ms. Pelech would be forced to call the police" (*id.*, ¶ 56). Ms. Vaughn alleges that she never recorded Ms. Pelech nor did she imply she would record her until *after* Ms. Pelech threatened to call the police (*id.*, ¶ 55). And, Ms. Vaughn alleges that Ms. Pelech admitted in her 911 call that she ordered Ms. Vaughn to leave the branch only because she thought Ms. Vaughn was being rude (*id.*, ¶ 57). There apparently is no dispute that Ms. Vaughn was not recording at the time Ms. Pelech called 911 (*id.*, ¶ 58).

Two Aurora police officers arrived at the Chase branch just six minutes after Ms. Pelech called 911 (*id.*, ¶ 59). The officers told Ms. Vaughn that they were responding to a report of trespassing (*id.*, ¶ 60). Ms. Vaughn explained her side of the story, told the officers that she was a Chase customer, and answered the officers' questions (*id.*, ¶¶ 61–67). Ms. Vaughn then told the officers that her husband was on the way to the bank, and that she would wait for him to arrive (*id.*, ¶ 67). One of the officers then spoke with Ms. Pelech separately to record her statement (*id.*, ¶ 68).

After some additional discussions separately with Ms. Vaughn and Ms. Pelech, the officers declined to arrest Ms. Vaughn or remove her from the property (*id.*, ¶ 78). She eventually left the bank with her husband (*id.*, ¶¶ 101–21).

In response to Ms. Pelech's actions, Ms. Vaughn filed suit in Arapahoe County District Court, seeking relief on four separate counts: (1) violation of the Colorado Anti-Discrimination Act against Chase; (2) discrimination on the basis of race and/or ethnicity in violation of 42 U.S.C. § 1981 against both Defendants; (3) negligent infliction of emotional distress against both Defendants, and (4) defamation per se against both Defendants (*id.*, ¶¶ 132–76). Defendants removed Ms. Vaughn's case to this Court on September 5, 2023.

About a year and a half before the incident described above, on February 5, 2021, Ms. Vaughn opened her Chase account (ECF No. 19 at 8). As part of enrollment, Chase required Ms. Vaughn to sign the Deposit Account Agreement (*id.* at 1). The Deposit Account Agreement contained the following arbitration provision:

> You and we agree that upon election of either of us, any dispute relating in any way to your account or transactions will be resolved by binding arbitration as discussed below. And not through litigation in any court (except for matters in small claims court).
>
> * * *
>
> What claims or disputes are subject to arbitration?
>
> Claims or disputes between you and us about your deposit account, transactions involving your deposit account, safe deposit box, and any related services with us are subject to arbitration. Any claims or disputes from or relating to this agreement, any prior account agreements between us, or the advertising, the application for, or the approval or establishment of your account are also included . . . .

(*id.* at 1–2, 8–10; ECF No. 28 at 4). It also contained the following "opt out" provision:

> YOU HAVE A RIGHT TO OPT OUT OF THIS AGREEMENT TO ARBITRATE, AS DISCUSSED BELOW. UNLESS YOU OPT OUT OF ARBITRATION, YOU AND WE ARE WAIVING THE RIGHT TO HAVE OUR DISPUTE HEARD BEFORE A JUDGE OR JURY, OR OTHERWISE TO BE DECIDED BY A COURT OR GOVERNMENT TRIBUNAL . . .

(ECF No. 19 at 3 (emphasis in original)).

The parties do not dispute that Ms. Vaughn signed the Deposit Account Agreement to open her Chase account (ECF No. 28 at 4). Nor do they dispute that she did not opt out of the arbitration provision (ECF No. 19-1 at 2). But they do dispute whether Ms. Vaughn's claims fall within the scope of the arbitration clause (ECF No. 28 at 4). This issue is the crux of the Motion to Compel. As explained below, Plaintiff's claims in this action are beyond the reach of the arbitration provision.

## II.  LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that a written arbitration agreement "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2. The FAA expressly permits a party to petition a federal district court to compel arbitration, just as Defendants have done here. 9 U.S.C. § 4.

Federal policy generally favors arbitration of disputes, *Comanche Indian Tribe of Oklahoma v. 49, L.L.C.*, 391 F.3d 1129, 1131 (10th Cir. 2004), but because "arbitration is a matter of contract[,] a party cannot be required to submit to arbitration any dispute which [that party] has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation and quotations omitted). Indeed, arbitration agreements are

generally treated like all other contracts. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (explaining that the FAA's "policy favoring arbitration does not authorize federal courts to invent special, arbitration-preferring procedural rules" (citation and quotations omitted)). "When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citation omitted); *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006).

In the instant case, there appears to be no dispute that Colorado law applies (ECF No. 19 at 12; ECF No. 28 at 5, 8). Under Colorado law, [t]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Pierce v. St. Vrain Valley School District RE–1J*, 981 P.2d 600, 603 (Colo. 1999) (citations and quotations omitted). In short, the parties must have "agreed upon all essential terms," *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986), and there must be a "meeting of the minds." *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022).

The party attempting to compel arbitration bears the burden of demonstrating that a valid arbitration agreement exists. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012). When the parties dispute the validity of an agreement to arbitrate, "a court may grant a motion to compel arbitration if there are no genuine issues of material fact regarding the parties' agreement." *Id.* (citation and quotations omitted).

Whether to enforce an arbitration agreement requires a court to employ a two-step process. The first step requires a court to determine whether there is an agreement that

provides the moving party the right to compel arbitration. *Cavlovic v. J.C. Penney Corp., Inc.*, 884 F.3d 1051, 1057 (10th Cir. 2018). If the movant satisfies the first step, the second step requires a court to determine  whether the allegations in the complaint are within the scope of the arbitration provision. *Id.* District courts are required to give the party opposing the motion to compel arbitration the benefit of all reasonable doubts and inferences. *Hancock*, 701 F.3d at 1261.

## III.  ANALYSIS

Defendants argue that (1) Ms. Vaughn entered into a valid agreement to arbitrate, (2) the Deposit Account Agreement contains a broad arbitration clause that creates a presumption of arbitrability, and (3) each of her claims arise from or relate to the Deposit Account Agreement (ECF No. 19 at 5–13). Ms. Vaughn counters by arguing that (1) Defendants have failed to present evidence that no genuine dispute of facts exists, (2) the Chase arbitration provision does not compel arbitration of her claims, and (3) none of her claims arise out of the Deposit Account Agreement (ECF No. 28 at 13).

Having considered Defendants' Motion to Compel Arbitration, related briefing, and the relevant legal authority, the Court declines to compel arbitration.

**A.    The Parties entered into a valid agreement to arbitrate claims related to Plaintiff's deposit account.[3]**

The Court must first decide whether there is an agreement to arbitrate between Chase and Plaintiff. *Cavlovic*, 884 F.3d at 1057. The Court finds that there is. On February 5, 2021, Plaintiff signed the Deposit Account Agreement containing the arbitration provision in question—a point Plaintiff does not dispute (ECF No. 19 at 2, ECF No. 28 at 4 ("Ms. Vaughn signed the DAA to open her Chase account.")).

Having answered the first question in the affirmative, the Court moves on to the second question of the two-part inquiry—whether Plaintiff's claims fall within the scope of the arbitration provision.

**B.    The scope of the Deposit Account Agreement's arbitration provision is not limitless.**

The Court now must determine whether the allegations in the Complaint fall within the scope of the arbitration provision. *Cavlovic*, 884 F.3d at 1057. To make this determination, courts "classify the particular [arbitration] clause as either broad or narrow." *Chelsea Fam. Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191,

---

[3] As a threshold matter, a district court generally must determine whether it has the power to rule on the issue of arbitrability, or whether an arbitrator should decide arbitrability. *See Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1280 (10th Cir. 2017) ("[T]he Supreme Court has held that when parties agree that an arbitrator should decide arbitrability, they delegate to an arbitrator all threshold questions concerning arbitrability—including 'whether their agreement covers a particular controversy.'" (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–79 (2010))). Because neither party contends that this threshold question has been delegated to an arbitrator, the Court proceeds with analyzing whether there is a valid arbitration agreement in this case. *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").

1196 (10th Cir. 2009) (quoting *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005)); *see also Cavlovic*, 884 F.3d at 1057.

> 1. The Deposit Account Agreement's arbitration provision is generally broad.

Where the arbitration clause is narrow, a court "must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Burlington N. & Santa Fe Ry. Co. v. Pub. Serv. Co. of Oklahoma*, 636 F.3d 562, 569 (10th Cir. 2010) (quoting *Cummings,* 404 F.3d at 1261). Collateral matters generally are outside the scope of a narrow arbitration clause. *Id.* But where the arbitration clause is broad, "there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Cummings*, 404 F.3d at 1261 (internal quotation and citation omitted).

Here, the Court finds that the Deposit Account Agreement's arbitration clause is of the "broad" variety. In *Cavlovic*, the Tenth Circuit held that "arising from or relating to" is "broad language." 884 F.3d at 1059. Compare that language with the identical language in the Deposit Account Agreement: "[a]ny claims or disputes arising from or related to this agreement . . . are also [subject to arbitration]" (ECF No. 19 at 3). This finding creates a presumption in favor of arbitrability. *Cavlovic*, 884 F.3d at 1059.

> 2. *Although the Deposit Account Agreement's arbitration provision contains broad language, Plaintiff's claims nonetheless fall outside the scope of the agreement.*

Determining that a provision is broad does not end the inquiry. Under Colorado law, the "factual allegations which form the basis of the claim asserted, rather than the legal cause of action pled, should guide the district court in making the determination as to whether a particular dispute falls within the reach of the ADR clause." *City & Cnty. of Denver v. Dist. Ct. In & For City & Cnty. of Denver*, 939 P.2d 1353, 1364 (Colo. 1997); *see also Cavlovic*, 884 F.3d at 1059 (finding under similar Texas law that, once a court deems an arbitration clause "broad," the court's inquiry continues by applying the facts of the case to the plain meaning of the agreement).

Here, Defendants argue that Plaintiff's claims "fall squarely" within the scope of the arbitration provision because her "claims are expressly tied to the DAA" (ECF No. 19 at 2). Defendants also argue that each of Plaintiff's claims "arise or relate to the DAA," stating that none of the claims alleged would exist absent the contractual relationship between the parties established by the Deposit Account Agreement (ECF No. 19 at 10–11). The Court disagrees with both arguments.

The Court finds *Cavlovic v. J.C. Penney Corp.* instructive. In *Cavlovic*, despite the agreement's broad language—which covered all claims "arising from or relating to" J.C. Penney's Credit Card Rewards Program—the Tenth Circuit found that the plaintiff's claims fell outside the scope of the arbitration provision. 884 F.3d at 1059. The plaintiff's dispute centered on J.C. Penney's alleged scheme of marking up products by a significant margin and then immediately offering those marked-up products at steep discounts to

boost sales. *Id.* at 1053. Although the plaintiff was a J.C. Penney cardholder who signed the Rewards Program agreement, the Tenth Circuit held that the plaintiff's claim fell outside the scope of the agreement.[4] *Id.* at 1059. The Tenth Circuit explained that "Cavlovic and J.C. Penney agreed to arbitrate disputes that 'aris[e] from or relat[e] to' the Rewards Program," but the plaintiff's allegations concerned facts outside the scope of the Rewards Program—namely that J.C. Penney falsely inflated the prices of its products only to "subsequently mark the prices back down to leave an impression of a deep discount." *Id.* at 1060 (alterations in original). The court went on to reason that, "with respect to the alleged wrong, it [was] simply fortuitous that the parties happened to have a contractual relationship." *Id.* (quoting *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1516 (10th Cir. 1995)).

The Court also finds *Jones v. Halliburton Co.* instructive. 625 F. Supp. 2d 339 (S.D.

---

[4] The court applied Texas law because the 2014 Rewards Program agreement had a Texas choice-of-law provision. *Cavlovic*, 884 F.3d at 1059. Texas law requires a court to "look at the parties' intent." *Id.* at 1059–60 (citing and quoting *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent."); *BBVA Compass Inv. Sols., Inc. v. Brooks*, 456 S.W.3d 711, 718 (Tex. App. 2015) (holding that "[w]hether a claim is subject to arbitration turns on its substance"); and *IHS Acquisition No. 171, Inc. v. Beatty–Ortiz*, 387 S.W.3d 799, 806 (Tex. App. 2012) (a determination of whether a party can compel arbitration "requires courts to honor parties' expectations").

Despite applying Texas law, Colorado courts apply the same basic principles of contract interpretation. *See N.A. Rugby Union LLC v. U.S. Rugby Football Union*, 442 P.3d 859, 863 (Colo. 2019) ("In construing an arbitration agreement, we look to the plain and ordinary meaning of the terms of that agreement, and we construe the agreement to effectuate the parties' intent and the purposes of the agreement."); *City & Cnty. of Denver*, 939 P.2d at 1364 ("The factual allegations which form the basis of the claim asserted, rather than the legal cause of action pled, should guide the district court in making the determination as to whether a particular dispute falls within the reach of the ADR clause."). The Court thus finds *Cavlovic* persuasive.

Tex. 2008), *aff'd*, 583 F.3d 228 (5th Cir. 2009). The plaintiff in *Jones* brought claims against her employer and several co-employees after she allegedly was drugged and brutally raped by several Halliburton employees in her employer-provided barracks room while deployed to Baghdad, Iraq. *Id.* at 352. She brought claims of  negligence; negligent undertaking; negligent hiring, supervision, and retention; sexual harassment and hostile work environment under Title VII; retaliation; false imprisonment; breach of contract; various fraud allegations; assault; battery; and intentional infliction of emotional distress. *Id.* at 344. She further contended that the corporate defendants were vicariously liable for the torts committed directly by its employees. *Id.* Halliburton moved to compel arbitration, arguing that the plaintiff agreed to arbitrate "any and all claims that [she] might have against Employer related to [her] employment, including [her] termination, and any and all personal injury claim arising in the workplace." *Id.* at 351.

The district court held that several of the plaintiff's claims fell beyond the outer limits of the broad arbitration provision. Specifically, the Court found that the plaintiff's claims for (a) vicariously liability for assault and battery; (b) intentional infliction of emotional distress arising out of that assault; (c) negligent hiring, retention, and supervision of the employees involved in the assault; and (d) false imprisonment were not related to her employment and thus beyond the scope of the arbitration provision. *Id.* The court commented that the "fact that the rape was allegedly perpetrated by Halliburton/KBR employees does not mean that the assault necessarily had anything at all to do with [the plaintiff's] employment." *Id.* at 352. It went on to say that the "arbitration clause did not require [the plaintiff] to arbitrate any and all claims against her employer,

without more. Instead, she [was] required to arbitrate any and all claims *related to her employment.*" *Id.* (emphasis in original). And finally, the court held that "[e]ven a broad provision such as this one has limits, and the Court can say with positive assurance that the alleged sexual assault in this case, and the abovementioned claims arising out of that assault, do not even touch on [the plaintiff's] employment." *Id.*

Here, just as in *Cavlovic* and *Jones*, the basis of the claims asserted in Plaintiff's Complaint—racial discrimination, defamation, and negligent infliction of emotional distress—have little or nothing to do with Plaintiff's Chase account, the terms of the Deposit Account Agreement, or the parties' relationship. *See also Coors,* 51 F.3d at 1516 (holding that antitrust claims that are not factually related to parties' contractual relationship were not subject to arbitration agreement). Stated differently, the "but for" causation that is present in many of the cases cited by Defendants is absent here. *See, e.g.*, *St. Charles v. Sherman & Howard L.L.C.*, No. 14-CV-03416-RM-CBS, 2015 WL 1887758, at *4 (D. Colo. Apr. 24, 2015) ("But for the Operating Agreement which establishes the Plaintiff's employment relationship to Defendants, Sherman & Howard and Wear could not have engaged in acts which allegedly violated Plaintiff's rights. The Operating Agreement sets forth Plaintiff's employment obligations and certain permitted actions by Sherman & Howard. Thus, it is not simply fortuitous that the parties had a contractual relationship. Rather, the Operating Agreement established the 'connection' through which actions allegedly in violation of Plaintiff's rights could occur." (citations to the record omitted)). In other words, Plaintiff's claims do not arise from, or relate to, the Deposit Account Agreement.

Defendants have not directed the Court to a single case involving an arbitration provision that required a similarly situated plaintiff to arbitrate claims of racial discrimination. Defendants correctly point out that at least two of their cited cases have required a plaintiff to arbitrate alleged violations of § 1981 (ECF No. 32 at 3–4). But the disputes in those cases arose in an employer–employee context and plainly centered on the workplace. *See Lambert v. Tesla, Inc.*, 923 F.3d 1246, 1248 (9th Cir. 2019) (alleging claims of harassment by fellow employees, failure to promote because of the plaintiff's race, and employment discrimination); *Cirino v. L. Gordon Holdings, Inc.*, No. 13-CV-4800, 2014 WL 2880291, at *1 (E.D. Pa. June 25, 2014) (alleging employer unlawfully subjected the plaintiff to discriminatory treatment based on his race, and that he was ultimately terminated by employer due to his race).

Defendants also direct the Court to eight decisions where "courts have regularly enforced the very same Chase DAA arbitration provision at issue in this case" (ECF No. 19 at 7, 7 n.7, 9). True, each respective court determined that the Deposit Account Agreement's arbitration provision was valid. But each case is distinguishable from the facts of this case because each dispute plainly related to Chase's banking services, and therefore, are "[c]laims or disputes between [the plaintiff] and [Chase] about [the plaintiff's] deposit account, transactions involving [the plaintiff's] deposit account, safe deposit box, and any related services" (ECF No. 19-3 at 25). *See, e.g.*,

- *KPA Promotion & Awards, Inc. v. JPMorgan Chase & Co.*, 2021 WL 1317163 (S.D.N.Y. Apr. 8, 2021) (granting Chase's motion to compel arbitration under the FAA after the plaintiffs alleged claims relating to their applications and denials for federally guaranteed COVID-19 Paycheck Protection Program loans from Chase);

- *Scott v. JPMorgan Chase & Co.*, 2014 WL 338753 (S.D.N.Y. Jan. 30, 2014), *aff'd*, 603 F. App'x 33 (2d Cir. 2015) (compelling arbitration of dispute alleging Chase unilaterally enrolled the plaintiff and other customers into Chase's Overdraft Protection Program, all of which "principally stem[med] from two withdrawals in her Checking Account");

- *Sha-Poppin Gourmet Popcorn LLC v. JPMorgan Chase Bank, N.A.*, 553 F. Supp. 3d 452 (N.D. Ill. 2021) (granting motion to compel arbitration under the Chase Deposit Account Agreement after plaintiffs, who were Chase customers, alleged that Chase did not process their Paycheck Protection Program loans in a timely manner);

- *Sunmonu v. Chase Bank, N.A.*, 2019 WL 1258788 (D. Md. Mar. 19, 2019) (customer sued Chase after the bank canceled "longtime" Chase customer's bank account alleging breach of contract, the court granted Chase's motion to compel arbitration);

- *Johnson v. JPMorgan Chase Bank, N.A.*, 2018 WL 4726042 (C.D. Cal. Sept. 18, 2018) (ordering arbitration of the plaintiffs' dispute concerning Chase's overdraft and insufficient-funds fees);

- *Sanchez v. J.P. Morgan Chase Bank, N.A.*, 2014 WL 4063046 (S.D. Fla. Aug. 15, 2014) (compelling arbitration after customers sued Chase for breach of contract and related claims after Chase temporarily lowered the transactional limits on the plaintiffs' debit cards in response to a third-party data breach);

- *Novak v. JP Morgan Chase Bank, NA*, 2008 WL 907380 (E.D. Mich. Mar. 31, 2008) (ordering arbitration of the plaintiffs' dispute involving allegedly unauthorized withdrawals, including forged checks, from their jointly held Chase account);

- *Dill v. JPMorgan Chase Bank, N.A.*, 2020 WL 4345755 (S.D.N.Y. July 29, 2020) (compelling arbitration over dispute concerning the escheatment of abandoned property payable on uncashed cashier's checks).

In each of the above cases, the dispute directly centered on the receptive plaintiff's relationship with Chase that pertained to account services. Here, that Plaintiff had an account with Chase is irrelevant. Plaintiff was not allowed to even attempt a bank transaction before she was approached and accused of nefarious conduct. Indeed, Defendants acted like Plaintiff was *not* a customer and had *no* relationship with Chase.

In addition to the cases cited above, Defendants assert that *Bhakta v. Choice Hotels Int'l, Inc.*, No. 16-1431-EFM, 2017 WL 86192, at *1 (D. Kan. Jan. 10, 2017), is on point (ECF No. 32 at 6). In that case, the plaintiffs owned and operated a Comfort Suites hotel. *Bhakta*, 2017 WL 86192, at *1. They sued Choice Hotels International, Inc., the franchisor of the Comfort Suites brand, for negligence stemming from the defendant's alleged failure to notify the plaintiffs about the termination of a contractor as a qualified vendor. *Id.* Plaintiffs sought damages for their lost payment to the contractor and for their financial losses resulting from the delayed hotel opening. *Id.*

Choice Hotels moved to compel arbitration to enforce the arbitration provision in the parties' franchise agreement, which required arbitration of "any controversy or *claim arising out of or relating to this Agreement* . . . ." *Id.* (emphasis in original). The plaintiffs did not dispute the validity of the arbitration provision, but they argued that their legal claim—a "wholly independent tort claim"—fell outside the scope of that provision. *Id.* at *2. In rejecting that argument, the court reasoned that the plaintiffs' claim directly related to the "rules and regulations" regarding Choice Hotels' standards and requirements for constructing, equipping, and furnishing the hotel. *Id.* at *3. And the franchise agreement

specifically required the plaintiffs to construct and furnish the hotel "according to the Agreement and the Rules and Regulations." *Id.*

The Court is not persuaded that *Bhakta* directs the result Defendants seeks. There, unlike here, the franchisees' claim was based on a contractual relationship with Choice Hotels. Absent the franchise agreement, the plaintiffs would have no claims against Choice Hotels. The facts alleged in Plaintiff's Complaint, however, stand independent from the Deposit Account Agreement. This case would be different if, for example, Plaintiff alleged that Defendants charged her a higher interest rate on a loan because of her race. In that hypothetical, Plaintiff's claim may relate to the Deposit Account Agreement. *See, e.g.*, *Cavlovic*, 884 F.3d at 1060 (hypothesizing that a dispute about whether the plaintiff was receiving an adequate number of Rewards Points may well arise from or relate to the Rewards Program).

"The factual allegations which form the basis of the claim asserted . . . [determine] whether a particular dispute falls within the reach of the ADR clause." *City & Cnty. of Denver*, 939 P.2d at 1364. Plaintiff's claims would exist outside any contractual relationship with Chase and therefore do not necessarily arise from or relate to the Deposit Account Agreement. *See Coors*, 51 F.3d at 1516 ("[I]f two small business owners execute a sales contract including a general arbitration clause, and one assaults the other, we would think it elementary that the sales contract did not require the victim to arbitrate the tort claim because the tort claim is not related to the sales contract. In other words, with respect to the alleged wrong, it is simply fortuitous that the parties happened to have a contractual relationship."); *Novak v. JP Morgan Chase Bank, NA*, 2008 WL

907380 (E.D. Mich. Mar. 31, 2008) (compelling arbitration in part because several of the plaintiffs' claims could not "be maintained without reference to their account and their relationship with Defendant"); *Mikes v. Strauss*, 889 F. Supp. 746, 754 (S.D.N.Y. 1995) (holding that the plaintiff's False Claims Act *qui tam* claims were outside the scope of the arbitration provision and reasoning that, "[e]ven if plaintiff had never been employed by defendants, assuming other conditions were met, she would still be able to bring a suit against them for presenting false claims to the government").

Moreover, the arbitration provision at issue contains limiting language that supports the Court's conclusion that Plaintiff's claims are outside the scope. For example, under the Deposit Account Agreement's header labelled "What claims or disputes are subject to arbitration?," the Deposit Account Agreement provides that "[c]laims or disputes between you and us about your *deposit account, transactions involving your deposit account, safe deposit box, and any related service* with us are subject to arbitration" (ECF No. 19-3 at 25). This limiting language indicates that disputes about Plaintiff's deposit account are subject to arbitration, not claims of racial discrimination—which are claims wholly independent from her account. *See Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1146–47 (10th Cir. 2014) (explaining that "limiting language" can include "restricting arbitration to any specific disputes or to the agreement itself"). Indeed, Plaintiff was approached by Ms. Pelech simply because she entered the branch and was sitting in the lobby.

Finally, despite the arbitration provision's generally broad language, the Court finds that the Deposit Account Agreement's arbitration provision must have some limiting

factor. *See Jones*, 625 F. Supp. 2d at 352 ("Even a broad provision such as this one has limits . . . ."), *aff'd*, 583 F.3d 228 (5th Cir. 2009) (agreeing that "even broad clauses have their limits" and are "not unbounded" (quotations omitted)).

> ### 3. There is no any evidence that Chase intended to require customers to arbitrate racial discrimination claims.

Defendants filed three declarations from senior Chase employees with their Motion to Compel Arbitration (ECF No. 19-1, No. 19-2, No. 19-6). The declarations detail how Chase customers, including Plaintiff, "Click to Sign" the Deposit Account Agreement when opening a new account (ECF No. 19-6 at 2–4). The declarations go on to detail how Chase updates the Deposit Account Agreement from time to time (ECF No. 19-2 at 2), and how Plaintiff and other customers supposedly "ratify" the newest version of the Deposit Account Agreement (ECF No. 19 at 4, ECF No. 19-6 at 6). And the declarations explain how customers are permitted to "opt out" of arbitration (ECF No. 19-1 at 2).

Missing from these declarations, however, is any evidence of the purported scope of Chase's arbitration provision. Without any evidence that Chase intended to include Plaintiff's claims within the purview of the arbitration provision, the plain text of the Deposit Account Agreement governs. Defendants do not provide any evidence that Chase intended to sweep racial discrimination claims under the arbitration provision. The Court finds the absence of this evidence compelling. Had Chase intended to include such claims within the purview of its arbitration provision, it could have done so. It chose not to. *See Winn v. Ensign U-Healthcare Resort of Leawood*, No. 19-CV-2715-EFM-JPO, 2020 WL 2849902, at *1–2 (D. Kan. June 2, 2020) (compelling arbitration where agreements

"clearly include a clause requiring claims related to race discrimination . . . to be submitted to arbitration").

Nor can Chase claim that it wasn't on notice that customers can allege—and have alleged—racial discrimination against the bank. *See, e.g.*, *Bowes-N. v. JPMorgan Chase Bank NA*, No. 3:21-CV-803 JD, 2022 WL 2237146, at *2 (N.D. Ind. June 21, 2022) (alleging that Chase racially discriminated against the plaintiff by requiring him to produce photo identification prior to accessing his account); *York v. JPMorgan Chase Bank, Nat'l Ass'n*, No. CV-18-04039-PHX-SPL, 2019 WL 3802535, at *1 (D. Ariz. Aug. 13, 2019) (alleging racial discrimination in violation of § 1981); *Coleman v. JPMorgan Chase Bank, N.A.*, No. 317CV00741-GNS-CHL, 2018 WL 6183285, at *1–2 (W.D. Ky. Nov. 27, 2018) (alleging that Chase discriminated against the plaintiff in violation of § 1981 after the bank froze her account to "investigate" payments by one of the plaintiff's parishioners); *Taylor v. JPMorgan Chase Bank, N.A.*, No. CIV. 13-24-GFVT, 2014 WL 66513, at *1 (E.D. Ky. Jan. 8, 2014) (alleging racial discrimination where Chase placed a hold on a check the plaintiff attempted to cash).[5]

Additionally, accepting Plaintiff's allegations in her Complaint as true for the instant purpose, Chase was aware at the time the parties entered the Deposit Account Agreement that Chase had faced previous complaints of racial discrimination (ECF No. 4, ¶¶ 122–31). For example, Plaintiff alleges five instances where Chase allegedly engaged in a pattern of discriminatory treatment against its Black customers (ECF No. 4

---

[5] The Court cites these cases for the sole purpose to show that Chase was on notice that customers have alleged racial discrimination claims against Chase.

at ¶¶ 123–26, 131). Beyond these five instances, Plaintiff further alleges that Chase has "admitted to receiving four complaints of racial discrimination since September 2021 at *the very same branch* where the discrimination against Ms. Vaughn took place," and that three of these complaints were made by Black customers (*id.*, ¶¶ 127–28 (emphasis in original)). It is clear that Chase cannot claim that it had no notice that racial discrimination cases brought by its customers may arise.

A court cannot compel arbitration over a dispute that the parties did not agree to arbitrate. *See Howsam*, 537 U.S. at 83. Despite the broad language of the arbitration provision at issue, Plaintiff's claims do not arise from or relate to the Deposit Account Agreement. Accordingly, Defendants' Motion to Compel Arbitration is denied.[6] *See Price v. Random House, Inc.*, No. CIVA07CV01347-RPM- MJW, 2009 WL 3415821, at *5 (D. Colo. Oct. 16, 2009) ("[A] court may compel arbitration of a particular dispute under § 4 of the FAA only when satisfied that the making of the agreement to arbitrate is not at issue." (quoting *Spahr v. Secco*, 330 F.3d 1266, 1269–70 (10th Cir.2003) (10th Cir. 2003) (quotation marks omitted))).[7]

### C. Defendant's Motion to Stay is denied as moot.

Defendants' Motion to Stay the Proceedings Pending Disposition of Defendants' Motion to Compel Arbitration (ECF No. 18) is moot and thus denied. Per Defendants'

---

[6] Because the Court has ruled that Plaintiff's claims are outside the scope of the Deposit Account Agreement's arbitration provision, the Court need not decide whether the provision is unconscionable as applied to claims of racial discrimination.

[7] Because the Court finds that Plaintiff's claims fall outside the scope of the Deposit Account Agreement's arbitration provision, it necessarily follows that Defendant Pelech is not entitled to enforce the arbitration provision in this case (*see* ECF No. 19 at 14).

request, their responsive-pleading deadline is 30 days from entry of this Order.

## IV. CONCLUSION

Defendants' Motion to Compel Arbitration and Stay Proceedings (ECF No. 19) is

DENIED. As a result, Defendants' Motion to Stay the Proceedings Pending Disposition of

Defendants' Motion to Compel Arbitration (ECF No. 18) is DENIED as moot.

DATED this 15th day of December 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge